In this case of attempted extortion through the fear of economic harm and an attempt to collect an extension of credit, we have to look at the context-specific concerns raised by the sufficiency of the evidence claim. The attempted extortion required the government to establish that Mr. DiDonna had no claim of right to the money that he was seeking and that he knew he had no claim of right. The context here is the relationship and the interactions between Mr. DiDonna, who was a sales representative, and Ray Buck and his wife, who owned a small farm in Maine, Archer Angus, selling beef that they were representing to be grass-fed Maine beef and the pasture-to-plate owned. Mr. DiDonna worked as an independent contractor for the company from January 2011 until June 2012. With respect, Ms. Meisner, we know the facts. We've prepared for this argument. Isn't the key here whether the jury could have interpreted the five conversations that were testified to that your client allegedly had with Buck and or Peters as constituting extortion rather than something more benign? Sure, and those conversations have to be placed in context. But the thing that matters most, words have meaning. And a fair-minded person looking at those words, our question is not how the three of us would interpret those conversations, but whether we think that a rational jury could interpret those conversations and conclude beyond a reasonable doubt that this was an extortionate threat. Correct. I think you have to look at the entirety of those conversations in the context of Mr. DiDonna's state of mind as well. There's no evidence of any agreement or industry practice that would preclude commissions after termination where he was hired to expand the business, and he did that. I think we documented the numbers of the increases in the sales during the time period that he was working there and the time period that came afterwards. He understands all that. The problem here is that the first two of those conversations in particular contain a pretty direct threat and no mention at all of these additional claims. I agree with you, the later conversations tend to be more ambiguous. In the first conversation on August 13th, Mr. DiDonna disagreed with Mr. Buck's statement that $16,000 and a mutual release were the terms of the agreement. He said there were no terms. That's not our original agreement and you know it. There's additional thousands and thousands of dollars that I can prove that you do owe me. But that's not a conversation where the threat was made. The threat was made in the next two conversations, right? Well, but I thought Your Honor was saying... I really meant the second and third. I brought them in this poll. Well, in the second and third conversations, the first discussion of the potential information was actually in the conversation with the unrecorded conversation with Mr. Peters. But in the September 3rd conversation, Mr. DiDonna also said there's an argument from my side to argue and if this ever went to court, one thing I would be arguing is hard dollars that I told you in emails were thousands and thousands of dollars that I can prove. And he also was looking for mutual releases that would include nondisclosure agreements and said he wasn't comfortable with the logistics and arrangements and lack of paperwork and cash transactions. I thought that was the fourth conversation. That was the... there were three recorded conversations. Yeah, but I'm not talking just recorded. There were testimony about five conversations, three of which were recorded. Right. This is in the second recorded conversation. Okay. All right. And... There were two unrecorded, then three recorded. That's my recollection.  And the conversations that I think give you a real problem on the first count, and I'm trying to move you along because to my mind the closest question involves the second count, the extension of credit allegations. All right. The conversations that give you the most problem are the second conversation, unrecorded, and the first of the recorded conversations. In both of those, there is a pretty frank threat and no mention of any ancillary payments, any ancillary monies owed for work done. Well, I think that the... and certainly in the first recorded conversation, there is the statement there's additional thousands and thousands of dollars. I know. I keep talking to you about the second... Okay. I understand they are more ambiguous, but the jury was entitled to focus on conversations two and three. But, well, the 813 is conversation number three. Okay. And I think that the jury has to look at all of the conversations as a whole. You can't just pick out one and say, okay, that's it. And I think that the second and third recorded conversations clearly set out Mr. Dadana's belief that he is owed money and his understanding that it would be very difficult for someone not to see and sympathize with my side of the equation. That when all of these facts come out, it's going to be more than that. That the strike against me, Dadana, is that I had a verbal agreement with you, someone that I thought was trustworthy. And that he was planning on paying taxes and he was looking for a check, nondisclosure, and mutual releases. These are not hallmarks of extortion. He knew that Mr. Buck was a hard bargainer. He had a voicemail from him where Mr. Buck said when he was talking about, complaining about the timing of one restaurant's payments, well, I'll be sure to smear his reputation any effing way I can. And this suggests that Dadana saying, I'm going to release truthful information that could affect your reputation is just recognizing that this is the kind of argument, hard bargaining, that Buck would respond to. And there was also Buck's confrontation of a chef in Boston, which resulted in the loss of an account. So you have Mr. Dadana aware of Mr. Buck's hard bargaining tactics and also feeling that he had been unfairly dealt with. That Buck had taken advantage of him and fired him after he had built up the business quite substantially. If you actually look at the sales, Buck says I'm firing you because your sales are flagging in July and September are our highest months. Well, if you actually look at the figures, that's not exactly accurate. And so you have what Mr. Dadana could legitimately view as a pretextual basis for firing because he's built up this business. And now Buck is telling him I'm only going to give you commissions up until the day that I'm terminating you. And he could legitimately have a belief that he's entitled to more for his efforts in building up the business to this point. And that the pretextual basis for this firing saying, well, it's declining, when in fact it was not declining in the manner that Buck was describing, would feed into this sense of unfair treatment. How does the government prove no claim of right? In this case, I don't think they can. You might have a, if you had a contract that set out, a written contract that set out what the terms were, and someone is demanding something that's not in the contract, that would be a case in which there was no claim of right. And here it was Mr. Buck who didn't want a written contract. Mr. Dadana had requested one. Is there anything in the record that the jury could have turned to to equate the $40,000 demand with a claim of right, arguably? Well, I think if you looked at all, they did have the figures. And a lot of these, most of these figures were developed by the Bucks. And that would, I think, give you a reasonable basis to say that that would be a fair settlement of the claim. You're going to get to the credit extension? I am getting to that right now. Okay, great. The second charge was the extension of credit by extortionate means. And I think that the government's theory in this case is basically saying that if you have any negotiations that aren't resolved with payment on a particular day, that that's going to be construed as an extension of credit. I think the government's position is that once A and B agree to an amount, that if payment of that amount is then deferred, that that constitutes an extension of credit. I'm not at all sure that that's what the law says, but that's what I think the government's position is. I think that the law is not very clear on this area. It's a very broad statute. It's a broad statute, and our latest take on it in Judge Barron's opinion, and I think it's Zedavian, indicates that we will take a very, that the courts in this circuit will take a very broad view of it. But I think if you look at the context of the statute itself, I mean the statute was part of the Consumer Credit Protection Act, you know, loan sharking. The statute was a loan sharking statute, but that claim has already long since left the station. It's clear it can be applied in a lot of other contexts now. I'm not arguing that it should be limited to loan sharking, Your Honor. I recognize that as well. But what I'm saying is that when you look at the scope to which you are going to extend it, it's not inappropriate to look back at its initial purpose and, you know, how far are you going to extend it. I mean, I agree, the language, extend credit, is extraordinarily broad. It's talking about repayment or satisfaction of any debtor claim, whether acknowledged or disputed, valid or invalid, and however arising, where there's an agreement that that may or will be deferred. So, but when you're talking about, if part of the negotiation, if part of the, this is the settlement that we are reaching, is that you will pay me X amount of money on Y date, is that an extension of credit if that is the initial term? And I suggest that it should not be. That where you, here you had a series of back and forth that ended with the agreement that there would be a payment of $40,000 and that it would be paid, that Donna was offering installment payments, and Buck said no, eight days, and so that is the final, that's the end of the negotiation there. That's the term of the negotiation. If he had said, if at the end of the eight, during the eight days, there had been a request for more time, I think that would properly be viewed as an extension of credit. But that the terms that you arrive at, at the end of your negotiation, should not be viewed as an extension of credit. I mean, none of the cases that I have seen addressed the, an extension of credit in terms of the end point of the original negotiations. They were all, all afterwards. I mean, Hoyle is a case that the court in the case that I always butcher the name of, in a footnote said, well, this is, we're not sure what we're doing with this. And that was the electrician who had not sent a bill and sent someone later to collect. But, and the court said, well, you could expect that you would have to, that you'd be paying. But, and there was some suggestion that maybe if you'd sent a bill, that that would be the time frame from which you would look on here. The time frame is the final date of the agreement set out the time frame for paying, and that that should, that should be viewed as the terms of the settlement, not an extension of credit. And is that the money isn't due until that date? That's right. The money was not, the money was to be paid on that date, and there was no further extension of credit after that date. Otherwise, any time you have a settlement in a negotiation where the money isn't to be paid on that day, you're going to have an extension of credit, and surely that could not have been the purpose of this statute. Thank you. Thank you. Chief Judge Howard, and may it please the Court, Mark Quinlivan on behalf of the United States. Mr. Quinlivan, would you start with the second count on the extension of credit question? Absolutely. And the defendant has raised two sort of statutory claims. The first is whether there was an extension of credit. In our view, under Section 891.1, this was an extension of credit. There was a repeated demand by the defendant that if the, Mr. Buck did not come up with a settlement amount within a week, he would reveal information. That continued on. It ultimately culminated with the recorded conversation in which there was an agreement to pay $40,000, and then thereafter there was an agreement that that payment would be made or delayed for eight days. Your arguments depend on our finding that there was an agreement. Despite the fact that it appears from a review of the transcripts and testimony about the conversations that it never got to the point of an agreement. Judge McConnell, I do believe in the final conversation there was an agreement. The defendant demanded he needed $40,000. He needed $30,000. So he needed $40,000 to be able to clear $30,000. Excuse me, that was the agreed upon amount. And then that was deferred for eight days so that Mr. Buck could collect money. Doesn't he say if we have an agreement? I would have to look back. I would too, then that's fine. I would have to look back at that. So here's what the problem is. First of all, all the initial back and forth in the negotiations, it sets the stage for the alleged extension of credit. But none of that can be an extension of credit because up until the time the parties agreed on the $40,000, there was no agreed amount. And it seems to me to follow a fortiori that you can't have an extension of credit if you don't know, if you haven't agreed on the amount due. So when the agreement is made on the $40,000, you look at that as a two-step process. We agree on $40,000. Step two, you agree to wait a week or ten days, whatever the period is, before you get payment. The defense looks at that as a unitary matter. All right? You agree to pay $40,000 on a date a week or ten days in the future, whatever the date is. All right? To be frank with you, the defense's interpretation of that has some appeal to me. Why isn't that the logical way to construe negotiations of that sort? It's not like a situation where money is due on a particular date and the parties agree to defer a payment. Judge, I guess my answer would be that that certainly was one of the arguments that was presented to the jury, and the jury may have concluded, based on that conversation, that it was a unitary agreement. There was other evidence pointing in a different direction. But, see, I think that this may be a question of law. All right? In other words, if you view this as a settlement, I think that, as a matter of law and not as a matter of fact, granted it can be altered in a particular case, but normally, all right, settlement is a process where you agree to settle a case or you agree to settle a debt, and I don't know of any legal requirement that that settlement be paid on the spot. Usually there's some delay, a delay either to get the money, a delay to get paperwork in order, a delay to do something. In other words, that's a normal incident of the act of settlement, and what makes this case different? I take your point, and I would just point out that I think those concerns I don't think are actually rooted in the text or aren't rooted in the text of 891.1. I think that has been, as my friend has acknowledged and as this Court has repeatedly stated, that the definition extension of credit has been broadly interpreted to encompass any agreement, express or tacit, whereby a sum of money, valid or invalid, is deferred or delayed. But how can you defer a payment if there's been no agreement as to the payment fee? That's the notion I'm struggling with. And, Judge Salia, I think if you go back and look, and my memory of the final recorded call is that an agreement is reached to the $40,000, and then there is subsequent discussion about we cannot get that right away. The defendant says, I think you can come up with half almost immediately, and there's further discussion, and then the date is set to defer that payment or to have that payment made eight days later. But the deferment, by its nature, had to have taken place, whether it was an hour when they would actually meet face-to-face or whether it was five or six or eight days. There had to be some period of time for that payment to be made as part of the payment, because they were on the phone. There was no immediate ability to transfer money. So how can the payment date be anything other than a term of the agreement to which they didn't come to any ultimate conclusion? It couldn't have been paid immediately. It had to be paid at some time. That had to be agreed to to effectuate the agreement, I would think. I understand, Judge McConnell. I mean, if they had said we'll pay you in an hour when I get to your house, would that be an extension of credit? I would have to think on that one, Judge McConnell. I think, again, under the terms of the statute, it is broadly construed. Of course, this question is just whether or not the extension of credit. Of course, to be a crime, it has to be an extension of credit through extortionate means. So it's not simply that any negotiation would involve a criminal violation of the statute. Yes, but part of what we're trying to do, or part of what I'm trying to do anyway, is to distinguish this, to find out what distinguishes this from Hobbs Act extortion. Well, I think it's- So that's why we're focusing on the extension of credit. No, no, that's right, Chief Judge Howard. And, in fact, there isn't a significant distinction in the sense that the other criminal means that supply the other aspect of the statutory violation is, in fact, the extortion. I mean, we're not arguing that it's otherwise. We're simply responding with respect to my friend's argument that because the statute in 891.7 talks about harm to the person, property, or reputation- But I don't see how that colors at all the question that we're focusing on. I thought you were saying that it does. No, no, I was acknowledging that this is the perhaps unusual case in which the extortion and extension of credit, the underlying other criminal means, is the extortion. So I acknowledge that point. Could I ask you an irrelevant question to our analysis, but one that has intrigued me, and that is why is the government- What effect does the conviction on the count for extension of credit have on the defendant here? Did it enhance his sentencing? Was there a mandatory minimum that came with it? No, Judge McConnell, it did not. I think the two counts were grouped. His offense level turned out to be 20. His criminal history was one. It was a 33-to-41-month GSR. So in terms of his calculations- That would have been true with just the Hobbs Act extortion as well. That's right. And I'd have to look back to see if the statutory maximum between the two changed, but I don't believe it did. If I could just, with the court's permission, just briefly clarify, I think, on the first count, the distinction that I think is most pertinent here, and that is that the jury reasonably could have found that the defendant repeatedly separated the threat. He was basically asking for a settlement in return for not disclosing information about Archer Angus, and repeatedly said that that information had the effect of putting- could have the effect of putting the defendant out of business, and that Mr. Buck had to come up with his own settlement amount and assess the potential damage. That was separated from the isolated comments when he indicated that he thought he was due additional compensation. So in the first two unrecorded calls between the defendant and Mr. Peters, the threat is made. There's no indication, Mr. Peter testified to, that anything was stated about additional compensation owed. In the first recorded conversation on August 17th, the defendant repeatedly says that if he has information that could put the defendant out of business, says if you don't, you run the risk of losing everything. He does say at one point that there's additional compensation, thousands that I'm owed, and if I have to ask for that too, I will. Again, separating the two. I think most pertinent was actually the August 22nd email to Peters, where he said that I'm willing to waive the thousands that I think I'm owed,  The September 3rd call, again, it's set in terms of the settlement amount is for, in return for not revealing information that would damage Arsher Angus. And although in the last recorded call, and as we acknowledge in our brief, the defendant does say that he views this as a business development settlement, the jury reasonably could have construed that as an after-the-fact self-serving statement, given the repeated earlier statements he had made that separated the two components. You would agree that if he actually had a definitive right to the $40,000 based on the commissions, that if he led with a PR argument, that is, I'm going to go out and ruin your business, that that wouldn't constitute a Hobbs Act, because he would have had a right to make the claim, correct? I think, Judge, depending on exactly what he was saying, yes. And your argument is merely that there was sufficient evidence to show that he had no right of claim, such that a jury could come to the conclusion that it was in fact extortion. That's right, and in fact, one additional data point, the jury, the defendant never identified, even though Mr. Buck and Mr. Peters repeatedly asked, what are you owed? He never identified that number. Instead, going back to saying, I want a settlement, and you have to assess how much your business is worth, because it could all be gone. Thank God. If the court has no other questions, we respectfully ask the court to affirm the judgment. Thank you. All right, thank you both. Thank you.